**SHORELINE TRANSPORTATION, INC.,** Petitioner–Appellee, v. **ROBERT'S TOURS AND TRANSPORTATION, INC.,** Respondent–Appellant

NO. 12375

(P.U.C. DOCKET NO. 5521)

AUGUST 31, 1989

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Finding Robert's Tours and Transportation, Inc. (Robert's), a motor carrier only authorized to render transportation service over "irregular routes" between points on the islands of Oahu, Hawaii, Maui, Kauai, and Molokai, was conducting a "regular route operation" between certain points on Maui, the Public Utilities Commission (the PUC or the Commission) issued a "cease and desist" order against the carrier. The carrier's appeal from the decision and order was assigned to the Intermediate Court of Appeals (the ICA) for hearing and disposition. Concluding "the Decision [was] a rule of general application which should have been but was not promulgated in accordance with the Hawaii Administrative Procedure Act, HRS chapter 91 (1985)[,]" the ICA set aside the decision and order. Shoreline Transportation, Inc. (Shoreline), who instigated the PUC action by filing a complaint against Robert's, applied for a writ of certiorari. We granted the writ in order to examine the often vexing question of whether an administrative agency must follow rulemaking or adjudicatory procedures in the circumstances. A review of the record and the applicable law confirming that the PUC properly engaged in adjudica-

tion in the situation at hand and committed no error in issuing its decision and order, we reverse the ICA.

I.

Shoreline is the holder of a Certificate of Public Convenience and Necessity (CPCN or certificate) issued by the PUC; it is authorized thereby to transport passengers by motor vehicle "Over Regular Routes On a Scheduled Basis Between Kapalua and Wailea and Intermediate Points On the Island of Maui." Robert's is also certified by the PUC to transport passengers by motor vehicle; its certificate authorizes the transportation of passengers "Over Irregular Routes Between Points on the Islands of Oahu, Hawaii, Maui, Kauai, and Molokai."

Shoreline filed a complaint with the Commission on March 18, 1986, alleging "Robert's has been and is transporting public passengers in an illegal regular route scheduled bus service between various points in the West Maui area (and also between points in the West Maui area and the Maalaea to Kihei to Wailea area) without proper authorization from [the] Commission." Attached to the complaint were "copies of Robert's published schedule of its scheduled regular route bus operations which were posted in public places in West Maui." Shoreline prayed that Robert's "be immediately ordered to cease and desist all scheduled regular route or 'shuttle' services . . . in the West Maui area[.]"

Following its Rules of Practice and Procedure, the Commission issued an "Order [directing Robert's] to Satisfy or Answer Complaint" within ten days. Robert's responded by denying the material allegations of the complaint. It then moved to dismiss the complaint on grounds that Shoreline "erroneously allege[d] . . . Robert's [did] not possess authority to run a regularly scheduled bus service in the Kihei and West Maui areas" and "Robert's shuttle service started on December 16, 1984." Attached to the pleading were copies of six documents purportedly demonstrating that Robert's had been operating a regularly scheduled "shuttle" service between points on Maui.

What was attached to the pleading were copies of documents submitted to the Commission by the Western Motor Tariff Bureau, Inc., a rate-making organization to which Shoreline and Robert's belonged, as proposed revisions of the bureau's published "Local and Proportional Passenger and Tour Tariff 8–B." All were entitled "Scheduled and Regular

Route Daily Bus Service on the Island of Maui." Four were further designated as "Only for the account of Shoreline Transportation, Inc. (Except as shown)," and two were designated as "Only for the account of Robert's Tours and Transportation, Inc."

Robert's claim that its "shuttle service started on December 16, 1984" was premised on the tariff revision submitted on November 14, 1984 and effective from December 16, 1984 "[o]nly for the account of Shoreline . . . (Except as shown)." The document indicated that Shoreline provided a daily bus service between Kapalua, Wailea, and intermediate points, with fixed departure times. There was a notation thereon stating a portion of Shoreline's schedule "[a]lso applie[d] as a shuttle via Robert's Tours and Transportation, Inc." There were similar notations on the other schedules submitted "for the account of Shoreline." The tariff revision submitted on March 7, 1986 "Only for the account of Robert's Tours and Transportation, Inc." showed a daily schedule of departures from fixed points and applicable fares. That submitted on Robert's behalf on March 19, 1986 showed routings from fixed points and fares, but the departure times were deleted. "Time schedules," the document stated, were "available at [the] carrier's office."

Shoreline responded with a memorandum in opposition and a motion of its own to dismiss Robert's motion. Observing no dispute on the material facts, the commission treated the motions as pleas for summary judgment. After hearing argument, the commission "concluded" that "Robert's published tariffs . . . and its daily fixed time schedule . . . demonstrate that Robert's is conducting an operation from Kapalua to Maui Plantation as a regular route operation because it is daily, systematic, scheduled, premeditated, service." Robert's, the commission further found, had "flagged in"[1] on Shoreline's routes and time schedules "without coming before the commission." And it concluded "that since Robert's [had] not applied for nor received any authorization . . . to operate *on a regular route basis* to those points stated in 2nd Revised Page 93–A [of 'Local and Proportional Passenger and Tour Tariff 8–B'] and to

[1] In the parlance of motor transportation, a carrier "flags in" when it adopts as its own a route serviced by another carrier or the tariff filed by another carrier.

Waikapu, Wailuku and Kahalui, [Robert's was] operating beyond the scope of the operating authority granted by the Commission." The commission ordered Robert's to "cease and desist . . . from conducting any regular route operation" and ordered the Western Motor Tariff Bureau to "file an appropriate tariff cancelling" those parts of revised Tariff 8–B referring to Robert's regular route operation.

Robert's moved for reconsideration of the decision and order, maintaining it was entitled to present evidence of "what it believes constitutes an irregular route operation as opposed to a regular route operation." The commission stayed enforcement of the order, and after hearing argument, granted the request for an evidentiary hearing. The day before the scheduled hearing date, however, Robert's moved to continue the hearing "until the Commission has determined the scope of an 'irregular route' CPCN during a rule making proceeding in which all carriers who hold such CPCNs have had notice and an opportunity to be heard." The motion was denied, and the hearing was conducted as scheduled.

The hearing yielded nothing in the way of evidence controverting the complaint that Robert's was operating a "regular route scheduled bus service between various points in the West Maui area." If anything, it served to confirm Shoreline's claim regarding Robert's operations. For example, Robert's counsel questioned the carrier's executive vice–president about his understanding of the operating authority granted by the commission. The relevant colloquy reads:

Q According to what Robert's practice has been, under this irregular route authority are you authorized to perform a shuttle service?

A Yes.

Q What is your understanding or the definition, your definition of a shuttle service?

A Transporting people from Point A to Point B on a regular basis.

Q And when you say on a regular basis, would that be on a scheduled basis?

A That's correct.

Q Under your understanding of irregular route authority, is Robert's allowed to on a scheduled basis between more than 2 or 3 points?

A Well, my understanding as far as the difference between regular and irregular has been that the irregular–, the irregular certificate holders were unrestricted and the regular routes were restricted as to . . .

He went on to describe Robert's scheduled service between Lahaina, Kaanapali, and Maui Plantation; the description is recorded in the following colloquy:

Q Let's turn now to the Kaanapali shuttle and to Exhibit 201. 201 is toward the very end of the packet. Mr. Iwamoto, could you tell the Commission what Exhibit 201 is?

A It's a copy of our schedule that the shuttle operates between Lahaina and Kaanapali and Maui Plantation.

Q Now would you describe for the Commission how that shuttle operates?

A Well, if you look towards the bottom part, where it says Lahaina wharf to Kaanapali, we pick up at 8:10 in the morning at the wharf in Lahaina, taking people out to Kaanapali; and then if you notice at 8:25 from the Royal Lahaina to Lahaina Town, we start at the Royal Lahaina at 8:25 and if you look beneath there under the Kaanapali stops, it says, depending on what hotel you're at or what property you're at, how many minutes to add to the listed time and that's approximately what time we're at these pickup[s]; and then from Kaanapali, we get into Lahaina Town.

The commission found "no facts, reasons, or authorities presented by Robert's" to cause an amendment of the previous decision and order. It concluded

that Robert's shuttle operation as shown in its Tariff 8–B, 1st Revised Page 93–A is a regular route operation and Robert's does not possess a certificate of public convenience and necessity for the service being provided. To operate as an irregular route operator in a given territorial area, Robert's must be bound to an operation that is indiscriminate, coincidental, non-scheduled, and unperiodical service. On the other hand, Shoreline has to run over its routes and maintain its schedule even if there are no passengers on the run because it requested such a service—clearly Robert's has not requested such an operation nor has it been given the authority to provide such a service.

The Commission, therefore, lifted the stay of enforcement and ordered Robert's and the Western Motor Tariff Bureau to comply with its decision and order.

Robert's appealed, and the appeal was heard by the ICA. The appellate court issued a memorandum opinion invalidating the PUC's decision and order. The decision, the court said, was a "rule" within the meaning of HRS § 91–1(4), and the PUC should have followed the rulemaking rather than the adjudicatory procedures outlined in the Hawaii Administrative Procedure Act in deciding the controversy between Shoreline and Robert's.

## II.

We begin our review of the ICA's ruling with a brief look at the difference between the rulemaking and adjudicatory functions of administrative agencies.

"Rulemaking is the process by which an agency lays down new prescriptions to govern the future conduct of those subject to its authority; adjudication is the process by which the agency applies either law or policy, or both, to the facts of a particular case." B. Schwartz, *Administrative Law* § 4.15, at 190 (2d ed. 1984). Rulemaking "is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy." Ginnane, *"Rule Making," "Adjudication" and Exemptions Under the Administrative Procedure Act*, 95 U. Pa. L. Rev. 621, 630 (1947). "Adjudication, conversely, is concerned with the determination of past and present rights and liabilities. Typically, there is involved a determination as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action." *Id.* at 630–31.

But "[t]he line between these two functions is not always a clear one and in fact the two functions merge at many points." *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 770 (1969) (Black, J., concurring).

For example, in exercising its quasi–judicial function an agency must frequently decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems. If the agency decision reached

under the adjudicatory power becomes a precedent, it guides future conduct in much the same way as though it were a new rule promulgated under the rule–making power, and both an adjudicatory order and a formal "rule" are alike subject to judicial review.

*Id.* at 770–71. Mr. Justice Black characterized these powers as "separate but almost inseparably related powers." *Id.* at 771.

The PUC exercises such powers by virtue of HRS § 271–9; it is empowered thereby "[t]o administer, execute, and enforce [the Hawaii Motor Carrier Law], to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedures for the administration." HRS § 271–9(a)(3).[2]  Whether it engages in rulemaking or adjudication, it must do so, of course, in accord with pertinent provisions of. the Hawaii Administrative Procedure Act (HAPA), HRS chapter 91.

HRS § 91–1(4) defines a "rule" as "each  agency statement of general or  particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, proce-

---

[2] The PUC's authority in these regards is spelled out in HRS § 271–9(b) and (c), which reads:

> (b) The commission may from time to time establish such just and reasonable classifications of groups of carriers included in the term "common carrier by motor vehicle" or "contract carrier by motor vehicle", as the special nature of the services performed by the carriers shall require, and such just and reasonable rules, regulations, and requirements, consistent with this chapter, to be observed by the carriers so classified or grouped, as the commission deems necessary or desirable in the public interest.

> (c) Upon complaint in writing to the commission by any person or body politic, or upon its own initiative without complaint, the commission may investigate whether any motor carrier has failed to comply with any provision of this chapter, or with any regulation, requirements, or order established or issued pursuant thereto. If the commission, after notice and hearing as prescribed in section 271–31, finds upon any investigation that the motor carrier has failed to comply with any provision, regulation, requirements, or order, the commission shall issue an appropriate order to compel the carrier to comply therewith. Whenever the commission is of the opinion that any complaint does not state reasonable grounds for investigation and action on its part, it may dismiss the complaint.

dure, or practice requirements of any agency." The definition follows closely the meaning given the term by the federal Administrative Procedure Act. [3] "If the words 'or particular' [therein] are literally applied, almost every [administrative] process . . . becomes rulemaking." 2 K. Davis, *Administrative Law Treatise* § 7:3, at 10 (2d ed. 1979). For example, "an order of [a regulatory agency] requiring a [regulated] company to cease and desist from a practice . . . fits perfectly the . . . definition of 'rule.' Yet [the] order is still regarded as an 'order.' And the . . . proceeding leading to it is regarded as an adjudication." *Id.*

When we had occasion earlier to consider the meaning of "rule" as defined by HRS § 91–1(4), we voiced agreement with Professor Davis that a literal application of the words "or particular" therein "would rob provisions of (HAPA) relating to 'adjudication' of virtually all meaning." *Aguiar v. Hawaii Hous. Auth.*, 55 Haw. 478, 485–86 n.13, 522 P.2d 1255, 1261 n.13 (1974) (quoting 1 K. Davis, *Administrative Law Treatise* § 5.02, at 295 (1958)). "For this reason," we said, "the use of the words 'or particular' in [HRS § 91–1(4)] probably does not significantly change the basic understanding of the distinction between rulemaking and adjudication held prior to the adoption of the [Administrative Procedure] Act." *Id.* at 486 n.13, 522 P.2d at 1261 n.13 (citations omitted).

### III.

We are convinced from a review of the record that the PUC was correct in following adjudicatory procedures here, though its decision and order also could be characterized as an "agency statement of general or

---

[3] "Rule" for purposes of the federal act

means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]

5 U.S.C § 551(4).

particular applicability and future effect that implements, interprets, or prescribes law or policy." HRS § 91–1(4). For our "basic understanding of the distinction between rulemaking and adjudication" tells us the resolution of the controversy between Shoreline and Robert's called for the employment of quasi–judicial rather than quasi–legislative procedures. *Aguiar v. Hawaii Hous. Auth.*, 55 Haw. at 486 n.13, 572 P.2d at 1261 n.13 (citations omitted).

## A.

To begin, Shoreline and Robert's are common carriers by motor vehicle. A "common carrier by motor vehicle [cannot] engage in operations on any public highway in this State, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the public utilities commission authorizing such operations." HRS § 271–12(a). "Any certificate covering the transportation of passengers [specifies] the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off–route points, if any, at which the motor carrier is authorized to operate[.]" HRS § 271–12(d). The exercise of the privileges granted by a certificate is also subject to "such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require[.]" *Id.*

Shoreline is the only carrier authorized to transport passengers "Over Regular Routes On a Scheduled Basis Between Kapalua and Wailea and Intermediate Points On the Island of Maui." As we noted, Robert's is only authorized to transport passengers "Over Irregular Routes Between Points on the Islands of Oahu, Hawaii, Maui, Kauai, and Molokai." In the complaint lodged with the commission Shoreline charged Robert's was operating a "regular route scheduled bus service . . . without proper authorization," thereby causing substantial financial harm to the authorized regular route carrier. The disposition of the complaint thus entailed a "determination of past and present rights and liabilities" of the two carriers; it "involved a determination as to whether [Robert's] past conduct was unlawful, so that the proceeding [was] characterized by an accusatory flavor [and] result[ed] in disciplinary action." Ginnane, *supra*, at 630–31. The proceeding, therefore, was one "in which the legal rights, duties, or privileges of specific parties [were] required by law to be

determined after an opportunity for agency hearing[,]" in other words, a "[c]ontested case" within the meaning of HRS § 91–1(5).[4]

### B.

Robert's, however, urges the decision and order in question is nonetheless a "rule" because it applies generally to "the entire class of irregular route carriers," has "future effect," and "necessarily 'implements, interprets, or prescribes law or policy,'" in that it goes beyond what is contained in § 271–12(d) H.R.S. by creating classifications of passenger carriers." We do not agree; for the accusatory proceeding called for a "contested case" hearing, and it involved a determination on whether or not Robert's had been operating in a manner only Shoreline had been authorized to operate.

Shoreline's authority was spelled out in its certificate to cover the transportation of passengers by motor vehicle "On Regular Routes On a Scheduled Basis Between Kapalua and Wailea and Intermediate Points on the Island of Maui." We fail to see why an adjudication of its rights thereunder could not proceed without rulemaking. And the PUC's decision "that Robert's shuttle operation as shown in its Tariff 8–B, 1st Revised Page 93–A is a regular route operation" cannot be faulted.

The memorandum opinion of the Intermediate Court of Appeals is vacated, and the decision and order of the Public Utilities Commission is affirmed.

---

[4] By virtue of HRS § 271–31(b), "[c]omplaints may be made, in writing, . . . by any person . . . setting forth any act or thing done, or omitted to be done by any motor carrier, . . . in violation or claimed to be in violation, of any law or of any order or rule of the commission." "Upon the filing of a complaint, the commission shall cause a copy thereof to be served upon the person or motor carrier complained of." HRS § 271–31(d). "The commission shall [thereafter] fix the time when and place where a hearing will be had upon the complaint and shall service notice thereof[.]" *Id.* "At the time fixed for any hearing before the commission or the time to which the hearing has been continued, the complainant and the person complained of, and such persons as the commission allows to intervene, shall be entitled to be heard and to introduce evidence." HRS § 271–31(e).

Thus, the commission was required by law to determine legal rights, duties, or privileges of specific parties after an opportunity for agency hearing.

*Wilbur K. Watkins, Jr.*, on the writ and brief, for petitioner.

*Pamela J. Larson (J. Douglas Ing* with her on the opposing memorandum and brief; Kobayashi, Watanabe, Sugita, Kawashima & Goda, of counsel) for respondent.