**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000045
29-JAN-2018
07:57 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

RICHARD W. BAKER, Appellant-Appellant, v.
BRICKWOOD M. GALUTERIA, ABIGAIL L. GALUTERIA, and
GLEN TAKAHASHI, City Clerk, City and County of Honolulu,
Appellees-Appellees

NO. CAAP-16-0000045

APPEAL FROM THE BOARD OF REGISTRATION, ISLAND OF OAHU
(CASE NO. 15-1)

JANUARY 29, 2018

FUJISE, PRESIDING JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY LEONARD, J.

Appellant-Appellant Richard W. Baker (**Baker**) appeals from the January 15, 2016 Findings of Fact, Conclusions of Law, Decision and Order (**Order**) entered by the Board of Registration for the Island of O'ahu (**Board**). In the Order, the Board concluded that the Appellees-Appellees Hawai'i State Senator Brickwood M. Galuteria (**Brickwood**) and Abigail L. Galuteria (**Abigail**) (together, the **Galuterias**) were residents of Royal

Capitol Plaza at 876 Curtis Street in Honolulu, Hawai'i (**Curtis Street Apartment**), with respect to their registration to vote in the November 2014 General Election.

Baker's primary contention is that the Galuterias resided at 3462 Pākui Street in the Pālolo neighborhood of Honolulu (the **Pālolo Property**), rather than at the Curtis Street Apartment. On appeal, Baker requests that this court: (1) declare that the Galuterias were improperly registered to vote in the November 2014 General Election; (2) declare that the Board's proceedings were in excess of its statutory and regulatory authority and that its decision is invalid; and (3) vacate the January 15, 2016 Order and award Baker reasonable attorney's fees and costs. As discussed herein, we conclude that the Board did not err in finding and concluding that the Galuterias' residence was the Curtis Street Apartment, and we affirm.

I.    BACKGROUND

On Sunday, November 2, 2014, Baker sent a letter[1] by email to the City and County of Honolulu (**City**) Office of the City Clerk challenging Brickwood's voter registration address at the Curtis Street Apartment.[2] In support of his challenge, Baker asserted that Brickwood claimed a real estate tax exemption for the Pālolo Property and for another property located at 45-565 Mahinui Road in Kāne'ohe (**Kāne'ohe Property**). Baker requested

---

[1]    This letter, which was emailed to clerks@honolulu.gov, contains a handwritten notation indicating that the letter was emailed at 6:10 p.m. on November 2, 2014, and faxed at 3:05 p.m. on November 3, 2014.

[2]    Although Baker's letter focuses primarily on Brickwood, it also appears to challenge Abigail's residency.

that the Office of the City Clerk investigate his claim and prohibit Brickwood from voting or, in the alternative, allow Brickwood to cast a provisional ballot.

On Monday, November 3, 2014, the City Clerk (**Clerk**)[3] sent a letter to Baker acknowledging receipt of his challenge of Brickwood's voter registration address. As Baker's challenge was emailed and unsigned, the Clerk asked Baker to return a signed copy of the November 2, 2014 letter to confirm that Baker was the person who sent the challenge. The Clerk also notified Baker that it was not able to separate Brickwood's ballot because Brickwood had voted by "absentee walk"[4] prior to the Clerk's receipt of Baker's challenge. Elections were held on Tuesday, November 4, 2014.

On November 13, 2014, the Clerk sent a letter to Brickwood notifying him of Baker's challenge. The Clerk requested information and documentation to substantiate the Curtis Street Apartment as Brickwood's residence, and asked Brickwood to submit any statements that would assist in making the determination that he had the intention to permanently occupy the Curtis Street Apartment and that he had abandoned any former residence.

---

[3] On November 3, 2014, the City Clerk was Bernice K.N. Mau (**Mau**). Mau retired on December 31, 2014, and Glen Takahashi (**Takahashi**) became the Acting City Clerk. On June 3, 2015, the City Council of the City and County of Honolulu confirmed Takahashi as City Clerk.

[4] "Absentee walk ballots are ballots cast by voters who vote prior to election day at a polling place outside of their precinct set up for early voting." Green Party of Hawaii v. Nago, 138 Hawaiʻi 228, 233 n.3, 378 P.3d 944, 949 n.3 (2016).

On December 6, 2014, Brickwood sent a letter to the Clerk confirming his residence at Curtis Street with Abigail and his mother, Juliette K. Galuteria (Juliette). Brickwood attached a copy of a rental agreement, signed on December 6, 2014, for the Curtis Street Apartment. The term of the rental agreement was for a period of one year, commencing on November 1, 2014 and terminating on October 31, 2015. Brickwood confirmed that he owns properties in Kāneʻohe and Pālolo and explained that he and Abigail "literally split [their] time between Curtis Street and Pālolo" due to Juliette's medical conditions and to assist their daughter and five grandchildren.

On December 12, 2014, the Clerk sent a letter to Brickwood informing him that a real property tax exemption results in a rebuttable presumption that the Pālolo Property is Brickwood's residence. The Clerk asked the Galuterias to submit any information or documentation to rebut the presumption of residency and support their habitation at Curtis Street. The Clerk also requested that the Galuterias respond to a list of six questions related to their habitation at the Curtis Street Apartment.

On January 5, 2015, the Galuterias submitted a response to the Clerk's request, which included, *inter alia*: pay stubs from Pacific Center for Economic Development and Entertainment Partners, bank statements from First Hawaiian Bank and Aloha Pacific Federal Credit Union, and a State of Hawaiʻi Department of Taxation Promise Reminder Notice. Additionally, the Galuterias submitted two earlier rental agreements for the Curtis

4

Street Apartment. The term of the first rental agreement was for a period of one year, commencing on June 15, 2011, and terminating on May 31, 2012. The term of the second rental agreement was for a period of one year commencing on November 1, 2013, and terminating October 31, 2014. The first rental agreement listed Juliette and Brickwood as tenants, and the second rental agreement listed Juliette as the tenant. Brickwood asserted that Juliette executed the second rental agreement without his knowledge. The Galuterias also submitted photographs of the Curtis Street Apartment, and Brickwood's affidavit in which he explained that due to family circumstances and health issues, he spends over 50 percent of his time at Curtis Street and less than 50 percent of his time at the Pālolo Property, and that Abigail spends 40 percent of her time at Curtis Street and 60 percent of her time at the Pālolo home. Brickwood declined the Clerk's request for the names and contact information of residents or employees that could verify their residence at Curtis Street. Brickwood did not consent to a site inspection of the Curtis Street Apartment.

On February 2, 2015, the Clerk issued a decision. The decision summarized research findings from government and public sources, as well as documents and sworn statements submitted by the Galuterias. The Clerk stated that the Clerk's Office was "unable to segregate the [Galuterias'] ballots from the General Election results" because the Galuterias voted prior to Baker's challenge, and their ballots were commingled with other in-person absentee voting cast ballots. The Clerk noted that the

Galuterias submitted pay stubs, paychecks, copies of statements from financial institutions, and a State of Hawai'i Department of Taxation notice to support their residency at the Curtis Street Apartment. As such, the Clerk determined that the Galuterias had rebutted the presumption of residency at the Pālolo Property, and concluded that the Galuterias' residence was the Curtis Street address.

On or about February 11, 2015, Baker sent a letter to the Board appealing the Clerk's February 2, 2015 decision. In his letter, Baker stated that "Senator Galuteria may have violated tax laws and regulations (city, state, and possibly federal) due to his false claims of property tax exemptions for two properties in Honolulu that are not his principal residence."

On March 13, 2015, the Board issued a Notice of Prehearing Conference (**Notice**). The Notice scheduled the prehearing conference for March 24, 2015. The Notice provided that the appeal was brought pursuant to Hawaii Revised Statutes (**HRS**) § 11-26 (2009), and would be conducted under the procedures of Hawai'i Administrative Rules (**HAR**) § 3-172-43 (2010).

On April 9, 2015, the Board issued a Prehearing Order; Notice of Disclosures of Potential Conflicts and Deadline to File Objections. Due to Baker's failure to file requested documents with the Office of Elections, the Board concluded that it "lack[ed] jurisdiction over whether Senator Galuteria is qualified to serve in the State Senate." The Board reiterated that it set a motions deadline, and a motions hearing date at the prehearing conference.

On or about April 14, 2015, the Galuterias filed a motion to dismiss Baker's appeal of the Clerk's February 5, 2015 decision (**Motion to Dismiss**). The Galuterias argued that they were entitled to a dismissal of the appeal because they presented substantial evidence of their residency at the Curtis Street Apartment, and Baker failed to present any evidence to support his voter registration challenge. In a May 5, 2015 response, Baker contended that the evidence submitted by the Galuterias "fails to rebut the presumption of their residency at Pakui Street and to substantiate their residency at Curtis Street." The Galuterias filed a reply memorandum on May 12, 2015.

The Board held a hearing on the Motion to Dismiss on May 26, 2015. The Board stated that it was treating the Motion to Dismiss "as the equivalent of a motion for summary judgment[.]" The Board also stated that Baker "has under the law the burden of producing evidence and the burden of proof as to the ultimate issues in his challenge of the residency of Senator Galuteria and Mrs. Galuteria." After hearing the parties' arguments, the Board requested that the City provide a response to the following three questions: (1) "explain how/why segregation of the Galuterias' cast absentee walk-in ballots was not possible;" (2) "why the Acting City Clerk did not discuss, in his February 2, 2015 ruling, the significance and/or impact of the Galuterias' Bishop Street address prior to moving to the Curtis Street address;" and (3) "why the Acting City Clerk proceeded to decide the issues presented in the voter registration residency challenge if the inability to segregate

7

the Galuterias' cast ballots 'mooted' the challenge." The Board requested that the Galuterias and Baker submit their response to the City's statement by June 16, 2015. The Board permitted the City to reply to any responses by July 2, 2015.

On June 8, 2015, the City filed a statement regarding issues raised at the hearing on the Motion to Dismiss (**Statement**). The City attached the Clerk's declaration to its Statement. The Clerk declared that the Galuterias voted in the absentee walk-in polling location at Honolulu Hale on October 30, 2014. The Clerk explained that after a person completes his or her ballot, the ballot is placed in a sealed box containing "every other ballot deposited therein." The voter retains a "ballot stub." The Clerk declared that "[o]nce a ballot stub is detached and the deposited ballot is placed into the sealed ballot box, the deposited ballot has no identifiable tracing marks, numbers, alphabets, codes, etc. to link the deposited ballot to a particular voter." The Clerk explained that the "bar markings/code, numbers along the side of the ballot do not identify the persons casting the ballot. The markings are computer readable information regarding polling place, precinct number, etc. for purposes of ballot tabulation." The City asserted that the Clerk does not have the "authority to unilaterally order the unsealing of the ballot box in order to segregate a ballot or ballots . . . without the concurrence of the State of Hawaii, Office of Elections." Additionally, the City asserted that the Galuterias' Bishop Street address was "irrelevant to the disposition of the voter registration

residency issue that was presented to the City Clerk based on what Mr. Baker asserted in his challenge (the Pakui Street real property tax exemption)."

On June 16, 2015, Baker filed a Second Response to Motion to Dismiss (**Second Response**). Baker argued that the Galuterias were not permitted to file a Motion to Dismiss under the HAR, and that the Motion to Dismiss "does not meet the Court Rules' standard." Baker also argued that the "[i]nvocation of the mootness doctrine is not permitted by statute or rule." Additionally, Baker contended that the "Clerk's failure to segregate the Galuterias' ballots prior to counting, for which there was an available procedure, improperly undercut the statutory framework for handling voter registration challenges."

On June 23, 2015, the Galuterias filed a motion to strike Baker's Second Response (**Motion to Strike**) pursuant to HAR § 3-172-43(d). The Galuterias contended that Baker's Second Response was improper and untimely because it raised arguments that should have been brought by May 5, 2015, *i.e.*, the Board's deadline to respond to any dispositive motions. Baker filed a response to the Motion to Strike on June 25, 2015. The Galuterias filed a reply memorandum in support of the Motion to Strike on June 26, 2015.

On October 16, 2015, the Board filed an order granting in part and denying in part the Motion to Strike, and denying the Motion to Dismiss. The Board granted the Galuterias' Motion to Strike to the extent that it "opposes the Galuterias' motion to dismiss as the Board previously set the briefing schedule and

arguments were heard on the motion to dismiss." The Board denied the Galuterias' Motion to Strike with regard to "those parts of Baker's second response that respond to the City Clerk's positions on the questions posed by the Board, i.e., regarding mootness and the segregation of ballots." With regard to the Motion to Dismiss, the Board determined that "there are material issues of fact present in the record that preclude dismissing Baker's appeal[.]"

The Board held a second prehearing conference on November 9, 2015, and issued a Second Prehearing Order on November 10, 2015. The Board requested that the parties submit their exhibit lists, witnesses list, and prehearing memorandum by November 23, 2015. The Board set a November 25, 2015 deadline for any responses to the prehearing memoranda.

On November 30, 2015, and December 5, 2015, an evidentiary hearing was held before the Board (**Hearing**). The Board accepted the parties' exhibits "in terms of authenticity, but not as to relevance and weight." Louise Black (**Black**), Eva Gallegos (**Gallegos**), Matthew Johnson (**Johnson**), Brickwood, and the Clerk testified at the Hearing.

Black was the first witness to be called by Baker to testify. Black testified that she has lived at Royal Capitol Plaza for eighteen years and that she has seen Brickwood at Royal Capitol Plaza. Black related that she was aware that Brickwood's mother lived at Royal Capitol Plaza. Black testified that she has never visited the Galuterias' apartment at the Royal Capitol Plaza. Black stated that she had no personal knowledge as to

whether Brickwood resides in Royal Capitol Plaza. Black also testified that she knew Baker because he was the campaign manager for Chris Lethem (**Lethem**), who had been running against Brickwood for State Senate in 2014, and that she supported Lethem.

Gallegos testified that she has lived at Royal Capitol Plaza for nine years. Gallegos testified that she has never seen Abigail at Royal Capitol Plaza. Gallegos related that her interactions with Juliette were "casual." Gallegos stated that she has seen Brickwood in the elevator at Royal Capitol Plaza. Gallegos testified that she has never visited the Galuterias' apartment in Royal Capitol Plaza. Gallegos also testified that she was a Lethem supporter.

Johnson testified that he has lived at Royal Capitol Plaza for eight years. Johnson related that he had no way of saying whether or not the Galuterias lived at Royal Capitol Plaza, but he had never seen them there. On cross-examination, Johnson admitted that he did not know what Abigail or Juliette looked like.

Brickwood testified at the Hearing. Brickwood explained that Abigail was not present at the Hearing because she suffers from a "high degree of chronic obstructive pulmonary disease." Brickwood related that he and Abigail had established the Pālolo Property as their voting residence in 2005. As to his claimed property tax exemption for the Pālolo Property, Brickwood testified that his failure to change his address with the real property assessment division was a mistake.

Brickwood testified that he and Abigail later resided at the Executive Centre at 1088 Bishop Street from 2007 to 2011. Brickwood stated that he and Abigail also maintained one of four units at the Pālolo Property in 2007. Brickwood explained that there were four families, including his daughter, her husband, and their five children, living at the Pālolo Property in 2007. When asked "[a]fter you established your residence at Executive Centre, how much time, if any, did you maintain at Pakui Street," Brickwood responded, "our grandchildren are there, so we'd be there as often as we possibly could. So you know, a couple of days a week, three days a week."

Brickwood related that he has resided at the Curtis Street Apartment since 2011 with Abigail and Juliette. Brickwood testified that he moved to the Curtis Street Apartment due to changes made to district boundaries for the 2012 election. When asked by Baker to identify his bed and Juliette's bed on a diagram of the Curtis Street Apartment, Brickwood indicated that he and Abigail slept on a pull-out sofa bed in the living room, and that Juliette slept in the bedroom. Brickwood said that he shares a closet with Abigail and Juliette. Brickwood also testified that he, Abigail, and Juliette planned to relocate to the Moana Pacific because "[Abigail's] pulmonary disease requires central air-conditioning. . . . [and also to] expand the living conditions and enter into a three-bedroom[.]" When asked by the Board "once you move [to Moana Pacific], you're not necessarily going to feel a need to keep a presence in Pālolo at all[,]" Brickwood replied, "[j]ust as a landlord. Landlord presence."

The Clerk also testified at the Hearing.  The Clerk explained that, upon receipt of a challenge, the City notifies the challenged voter and provides them with an opportunity to respond.  The City conducts its own investigation and eventually the Clerk makes a ruling on the voter registration challenge.  As to Baker's challenge, the Clerk testified that the Galuterias were registered to vote at the Pālolo address, then a Bishop Street address, and then at the Curtis Street address.  The Clerk also testified that there was no challenge involving the Galuterias' Bishop Street voter registration address.  The Clerk stated that the Galuterias had claimed a homeowner real property tax exemption for the Pālolo Property, which created a rebuttable presumption of residency there.  The Clerk testified that the Galuterias submitted rental agreements, bank statements, pay checks, and sworn statements to establish their residency at Curtis Street.  Upon review of the documents and statements, the Clerk was satisfied that the Galuterias had rebutted the presumption of residency in Pālolo.

On January 15, 2016, the Board issued its Order.  The Board concluded that Baker had not met his burden of proof that the Galuterias did not reside at the Curtis Street Apartment for voting purposes.  The Board also concluded that the Galuterias had rebutted the presumption that their actual residence was the Pālolo address, and that for the 2014 elections the Galuterias were residents of the Curtis Street Apartment.  The Board made several Findings of Fact (**FOFs**) and Conclusions of Law (**COLs**) including, *inter alia*, the following FOFs:

13

2. In 2005, [Abigail] inherited property at 3462 Pakui Street, in Palolo Valley, in the City and County of Honolulu (the "Palolo property"). Currently, Brickwood and [Abigail] jointly own that property.

3. There are four residential units on the Palolo property. From 2005 until mid-2014, the Galuterias' daughter resided in one of those residential units with her husband and their five children. In mid-2014, the daughter experienced a "tumultuous separation" from her husband, who left, and she and the children remained at Palolo.

4. The Galuterias have retained one unit on the Palolo property so that they may retain a "presence" on it.

5. When the Galuterias initially acquired the Palolo property, they applied for and received from the Real Property Assessment Division of the City and County of Honolulu a partial "homeowner" exemption from their real property taxes on this property as owner-occupants. *See, e.g.*, annual assessment notices for Tax Years July 1, 2011 through June 30, 2016. Appellant's Hearing Exhibits 6-10.

6. In 2007, the Galuterias began occupying Suite 2812 at the Executive Centre, at 1088 Bishop Street in downtown Honolulu as their new residence. Brickwood and [Abigail] both executed voter registration applications dated August 30, 2007, showing this address as their residence.

. . . .

10. In early 2011, the Galuterias ascertained that redistricting would change the boundaries of District 12, and that Executive Centre would no longer be part of that district.

11. Accordingly, to ensure that Brickwood could continue to represent District 12 in the State Senate, the Galuterias decided to relocate to the Kaka'ako area. At the same time, they agreed with Brickwood's mother, Juliette, that she would relocate from Kane'ohe to the same residential unit as the Galuterias, because Juliette was advancing in years and suffered from various age-related illnesses and limitations.

12. The Galuterias and Juliette rented Unit 2408 of the Royal Capitol Plaza, at 876 Curtis Street in Kaka'ako, commencing as of June 15, 2011. A factor in the decision to choose the Curtis Street residence was that Juliette's church is only one block away, and this enables her to visit her church every day.

. . . .

16. On or about October 30, 2014, the Thursday prior to the general election day of Tuesday, November 4, 2014, the Galuterias voted by absentee walk-in ballot. Thereafter, pursuant to the regular processing of mail-in and walk-in absentee ballots, the Galuterias' ballots were commingled with those of thousands of

other mail-in and walk-in absentee ballots and could not be isolated from them as of the time that the challenge to them was made.

. . . .

18.     For reasons that remain unclear, Baker's complaint has made no reference to the Galuterias' prior residence at Executive Centre, but rather Baker has contended that the Galuterias never abandoned their Palolo residence.

. . . .

22.     During December 2014 and January 2015, the Clerk conducted an investigation of the Galuterias' claims to be residents at Curtis Street for voting purposes. The Clerk took into account the addresses listed by the Galuterias on their drivers' licenses and vehicle registrations, and the claims by the Galuterias that they regularly received mail related to Brickwood's employment, and other mail at the Curtis Street address. The Clerk also took into consideration the fact, admitted by the Galuterias, that the Galuterias had been claiming a homeowner's property-tax exemption with respect to the Palolo property ever since they acquired the property in 2005.

23.     Although the Galuterias abandoned their residence at the Palolo property in 2007, they did not promptly request that the property tax assessment status for that property be modified to reflect that they were no longer owner-occupants of the Palolo property. They made such a request in late 2014, after Baker had made public that the Galuterias were continuing to claim favorable tax treatment as owner-occupants of the Palolo property.

Baker filed a notice of appeal on January 25, 2016.

II.   POINTS OF ERROR

On appeal, Baker raises four points of error, contending that the Board:   (1) clearly erred by finding that the Galuterias had abandoned the Palolo Property as their residence in 2007;  (2) abused its discretion by affirming the Clerk's decision despite substantial evidence of the Clerk's violation of statutory procedures for Baker's challenge and for failing to segregate the Galuterias' ballots;  (3) based its Order on unlawful procedures, including fact-finding, receiving argument, and delegating or failing to delegate to the chairperson; and (4)

engaged in unlawful procedures prior to the evidentiary hearing by following rules that were not promulgated pursuant to HRS § 91-3.

III. APPLICABLE STANDARDS OF REVIEW

> An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error. *A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case.*
>
> As a general matter, a finding of fact or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Dupree v. Hiraga, 121 Hawai'i 297, 312, 219 P.3d 1084, 1099 (2009) (quoting Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore & Warehouse Union, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006)).

"Interpretation of a statute is a question of law which we review *de novo*." Kikuchi v. Brown, 110 Hawai'i 204, 207, 130 P.3d 1069, 1072 (App. 2006) (quoting Gap v. Puna Geothermal Venture, 106 Hawai'i 325, 331, 104 P.3d 912, 918 (2004)).

> General principles of statutory construction apply in interpreting administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawai'i 1, 11, 332 P.3d 144, 154 (2014) (quoting Liberty Dialysis-Haw., LLC v. Rainbow Dialysis, LLC, 130 Hawai'i 95, 103, 306 P.3d 140, 148 (2013)).

IV. DISCUSSION

A. Abandonment of the Pālolo Property

Baker argues that the Board clearly erred by finding that the Galuterias abandoned the Pālolo Property as their residence in 2007. Before addressing this contention, we put the issue in context.

HRS § 11-12(a) (2009) provides, in relevant part, that "[n]o person shall register or vote in any other precinct than that in which the person resides[.]"[5] HRS § 11-13 (2009) sets forth the rules for the determination of a person's residency, as follows:

> § 11-13 **Rules for determining residency.** For the purpose of this title, there can be only one residence for an individual, but in determining residency, a person may treat oneself separate from the person's spouse. The following rules shall determine residency for election purposes only:
>
> (1) The residence of a person is that place in which the person's habitation is fixed, and to which, whenever the person is absent, the person has the intention to return;
>
> (2) A person does not gain residence in any precinct into which the person comes without the present intention of establishing the person's permanent dwelling place within such precinct;
>
> (3) If a person resides with the person's family in one place, and does business in another, the former is the person's place of residence; but any person having a family, who establishes the person's dwelling place other than with the person's family, with the intention of remaining there shall be considered a resident where the person has established such dwelling place;
>
> (4) The mere intention to acquire a new residence without physical presence at such place, does not establish residency, neither does mere physical presence without the concurrent present

---

[5] In addition, pursuant to article III, section 6 of the Hawai'i Constitution, to be eligible to serve as a member of the Hawai'i Senate, a person must be a qualified voter of the senatorial district from which he or she seeks to be elected.

> intention to establish such place as the
> person's residence;
>
>     . . . .
>
> In case of question, final determination of residence shall
> be made by the clerk, subject to appeal to the board of
> registration under part III of this chapter.

The Hawai'i Supreme Court examined these rules in

Dupree v. Hiraga, 121 Hawai'i 297, 219 P.3d 1084 (2009). In

Dupree, several individuals challenged the residency of Solomon

P. Kaho'ohalahala (**Kaho'ohalahala**), a candidate for the Lāna'i

seat on the Maui County Council. Id. at 299-300, 219 P.3d at

1086-87. Kaho'ohalahala was registered to vote on Lāna'i from

1982 to 2006. Id. at 299, 219 P.3d at 1086. In 2006,

Kaho'ohalahala registered to vote as a resident of Lahaina, Mau'i.

Id. In 2008, Kaho'ohalahala registered to vote as a resident of

Lāna'i. Id. Following its investigation, the Clerk of the .

County of Maui (**Maui Clerk**) concluded that Kaho'ohalahala was a

resident of Lāna'i "when he registered to vote there in July

2008." Id. The Board concluded, however, that Kaho'ohalahala

was a resident of Lahaina, and the supreme court affirmed. Id.

at 324, 219 P.3d at 1111.

In Dupree, the supreme court recognized that HRS § 11-

13(4) "requires both action and intent on the part of the voter

before a new residence is established." Id. at 318, 219 P.3d at

1105. The voter must have the requisite intent to "acquire a new

residence," and by implication the "intent to abandon his or her

prior residence, since a person can have only one residence under

the statute." Id. The supreme court determined that

Kaho'ohalahala lost his Lāna'i residency when he registered to

vote in Lahaina in 2006. Id. at 318, 219 P.3d at 1105. The supreme court explained that Kahoʻohalahala's change of voter registration address constituted a "statement of intent" that he resided in Lahaina. Id. Kahoʻohalahala's "statement of intent, together with his habitation on Maui, established Maui as his residence." Id. (citing HRS §§ 11-13(1) & (4)). Additionally, Kahoʻohalahala lacked sufficient physical presence on Lānaʻi. Id. at 319-20, 219 P.3d at 1106-07. "[W]hat is required is not momentary, or occasional or sporadic physical presence; it is significant physical presence consistent with the ordinary conception of living (or abiding, or residing, or dwelling, or maintaining a habitation) in a place." Id. at 321, 219 P.3d at 1108 (citation, internal quotation marks, and emphasis omitted). There was substantial evidence to establish that Kahoʻohalahala "did not own or work for a business on Lānaʻi, and did not own or rent a house or keep a car on the island." Id. at 319, 219 P.3d at 1106.[6]

Thus, the issue of a person's "abandonment" of his or her former residency stems from the rule that a person cannot reside at more than one place at a time for the purposes of establishing residency for voter registration. If an individual does not intend to give up his or her former residence or does

---

[6] The supreme court further noted that the Board's finding that Lānaʻi residents had not seen Kahoʻohalahala at the post office, bank, gas station, or any restaurants supported "the inference that Kahoʻohalahala had not established a sufficient physical presence on Lānaʻi." Dupree, 121 Hawaiʻi at 320, 219 P.3d at 1107.

not actually do so, that individual cannot establish a new residency pursuant to HRS § 11-13.

HAR § 3-172-25 provides further guidance, in relevant part, as follows:

> § 3-172-25 <u>Determination of residence</u>. (a) In addition to the rules for determining residency provided in HRS § 11-13, the following shall also be applicable in determining the residence of a person for election purposes:
>
> (1) The residence of a person is that place in which the person's habitation is fixed, where the person intends to remain, and when absent intends to return;
>
> (2) When a person has more than one dwelling:
>
> (A) If a person maintains a homeowner's property tax exemption on one of the dwellings, there shall be a rebuttable presumption that the dwelling subject to the homeowner's property tax exemption is that person's residence;
>
> . . . .
>
> (c) For purposes of this section, a rebuttable presumption is a presumption considered true unless proven false by evidence to the contrary.

Finally, we note that HAR § 3-172-43(h), which governs appeals to the Board, states that "[r]ules of evidence as specified in HRS § 91-10 shall be applicable thereto." HRS § 91-10(5) states that "[e]xcept as otherwise provided by law, the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof shall be a preponderance of the evidence."

In this case, the Board found that the Galuterias abandoned the Pālolo Property in 2007, when they began occupying and established a new residence at the Executive Centre in

20

downtown Honolulu.  The Galuterias executed voter registration applications for this address in August of 2007, thus manifesting a "statement of intent" under HRS § 11-13(1) to establish residency at the Executive Centre.  See Dupree, 121 Hawai'i at 318, 219 P.3d at 1105.  The Galuterias "renounced [their] preexisting residency" when they registered to vote at the Executive Centre address, as well as physically resided there.  See id. at 319, 219 P.3d at 1106.

However, as argued by Baker and addressed by the Board, even after their move to the Executive Centre, as well as their later move to the Curtis Street Apartment, the Galuterias did not promptly request that the property tax assessment status for the Pālolo Property be modified to reflect that they were no longer owner-occupants.  Accordingly, pursuant to HAR § 3-172-25, there was a rebuttable presumption that the Pālolo Property was the Galuterias' residence.  Both the Clerk and the Board concluded that the Galuterias adequately rebutted this presumption.  The evidence included, *inter alia*, the addresses listed by the Galuterias on their driver's licenses and vehicle registrations, regularly-received mail, including mail related to Brickwood's employment and from financial institutions, rental agreements (albeit with gaps), sworn statements, photographs of the Curtis Street Apartment, the Galuterias' arrangement to revise the property tax status and pay increased back taxes to the City, and Brickwood's testimony at the hearing before the Board.  This

21

evidence constitutes substantial evidence in support of the Board's findings and the Board's conclusions that the Galuterias rebutted the presumption that the Pālolo Property was their residence.

The Clerk and the Board also weighed the evidence concerning Brickwood's continued ties to the Pālolo Property, including the substantial periods of time that Brickwood and Abigail spent there in 2014. The Board heard and considered the testimony of Baker's witnesses. The Clerk and the Board recognized that the Galuterias' daughter and five grandchildren lived at the Pālolo Property and that the Galuterias retained one of the four units at the property and spent a great deal of time there with their extended family. We reject Baker's suggestion that it was necessary for the Galuterias to abandon all ties to the Pālolo Property in order to abandon it as their residence and establish a new residence. The Clerk and the Board found and concluded that the Galuterias did in fact abandon the Pālolo Property as their residence and had both the intent and physical presence necessary to establish a new permanent dwelling place, first at the Executive Centre in 2007, and later at the Curtis Street Apartment commencing in 2011 through the 2014 General Election. We conclude that there was substantial evidence in the record to support this determination.

B.    Ballot Isolation

Baker contends the Board clearly erred in finding that the Galuterias' ballots could not be isolated, erroneously interpreted the City Clerk's obligation under HRS § 11-25 and HAR § 3-172-103 to do so, and otherwise erred in acting on Baker's challenge.

HRS § 11-25 (2009 & Supp. 2016) states:

> **§ 11-25  Challenge by voters; grounds; procedure.**  (a) Any registered voter may challenge the right of a person to be or to remain registered as a voter in any precinct for any cause not previously decided by the board of registration or the supreme court in respect to the same person; provided that in an election of members of the board of trustees of the office of Hawaiian affairs the voter making the challenge must be registered to vote in that election.  The challenge shall be in writing, setting forth the grounds upon which it is based, and be signed by the person making the challenge.  The challenge shall be delivered to the clerk who shall forthwith serve notice thereof on the person challenged.  The clerk shall, as soon as possible, investigate and rule on the challenge.
>
> (b)  Any voter rightfully in the polling place, including absentee polling places established pursuant to section 15-7, may challenge the right to vote of any person who comes to the precinct officials for voting purposes. The challenge shall be on the grounds that the voter is not the person the voter alleges to be, or that the voter is not entitled to vote in that precinct; provided that only in an election of members of the board of trustees of the office of Hawaiian affairs, a person registered to vote in that election may also challenge on the grounds that the voter is not Hawaiian.  No other or further challenge shall be allowed.  Any person thus challenged shall first be given the opportunity to make the relevant correction pursuant to section 11-21.  The challenge shall be considered and decided immediately by the precinct officials and the ruling shall be announced.
>
> (c)  If neither the challenger nor the challenged voter shall appeal the ruling of the clerk or the precinct officials, then the voter shall either be allowed to vote or be prevented from voting in accordance with the ruling.  If an appeal is taken to the board of registration, the challenged voter shall be allowed to vote; provided that ballot is placed in a sealed envelope to be later counted or rejected in accordance with the ruling on appeal.  The chief election officer shall adopt rules in accordance with chapter 91 to safeguard the secrecy of the challenged voter's ballot.

23

HAR § 3-172-103 further provides:

> § 3-172-103 <u>Challenged voter's ballot; disposition of</u> <u>at counting center.</u> (a) The board of registration shall notify the clerk and the counting center manager of the disposition of each challenge immediately after the board makes its decision provided that if an appeal is made to an appellate court, or the opportunity for an appeal exists, pursuant to HRS § 11-51, the ballot shall remain in the sealed envelope to be counted or rejected in accordance with the supreme court's ruling.
>
> (b) If the board rules that a challenged voter is not entitled to vote and the opportunity for appeal to an appellate court has elapsed, pursuant to HRS § 11-51, the voted ballot shall remain in the unopened envelope and shall be stored as provided by law.
>
> (c) If the board rules that a challenged voter is entitled to vote and the opportunity for appeal to an appellate court has elapsed, pursuant to HRS § 11-51, the counting center manager shall instruct the ballot preparation team to prepare the ballot for processing. The ballot shall be inserted into the ballot deck of the appropriate precinct using procedures established by the chief election officer. In all cases, the secrecy of the ballot must be preserved. If the secrecy of the ballot cannot be preserved, the challenged ballot shall not be processed except to break a tie vote, as ordered by the appellate court. It shall be disposed of as provided by law.

The Galuterias voted by absentee walk-in ballots at the Honolulu Hale polling location on October 30, 2014, days prior to Baker's submission of his challenge to their voter registration. As explained in the Declaration of then-Acting Clerk Takahashi, during the course of the voting process, a voter receives a ballot with a detachable ballot stub. The ballot is deposited into a sealed ballot box and the voter retains the stub. Deposited ballots are commingled and have no codes or numbers that link them to particular voters.

Baker contends that the Clerk failed to enforce HRS § 11-25(c), which requires a challenged voter's ballot to be placed in a sealed envelope to be later counted or rejected,

because the Clerk failed to set aside the Galuterias' ballots upon receipt of Baker's challenge. Baker points to the procedure set forth in HAR § 3-172-103 and argues that all of the walk-in ballots cast in the Galuterias' precinct should have been segregated upon the unsealing of the ballot boxes on Election Day and held pending a determination of the Galuterias' eligibility to vote in their precinct.[7] Baker contends that the Clerk failed to adhere to "statutory" procedures for a pre-election day challenge. However, the pre-election day procedure referenced by Baker contemplates a challenge prior to a ballot being cast, deposited in the ballot box, and commingled with other ballots. Baker identifies no statute or administrative rule authorizing the Clerk to unseal a ballot box in order to attempt to segregate a ballot or ballots, or to segregate all absentee walk-in ballots cast for an entire precinct on Election Day when the ballot boxes are unsealed, and we find none.

Baker also relies on Dupree to support his argument that the Clerk erred in failing to locate and segregate the Galuterias' ballots. However, the instant case is notably distinguishable from Dupree. In Dupree, several Lāna'i residents challenged Kaho'ohalahala's voter registration status for the November 4, 2008 General Election. 121 Hawai'i at 300-02, 219 P.3d at 1087-89. The residents submitted their challenges to the

---

[7] The Clerk submits that segregation of the absentee walk-in ballots commingled with the Galuterias' ballots would have disenfranchised roughly 2,000 other voters. Baker argues that it was possible just to segregate the ballots cast in the Galuterias' precinct, which was a total of 184 ballots.

Maui Clerk's office from September 23, 2008, to October 3, 2008. Id. On October 10, 2008, the Maui Clerk issued its decision and concluded that Kaho'ohalahala was a resident of Lāna'i. Id. at 303-04, 219 P.3d at 1090-91. On November 1, 2008, three days prior to the general election, the Board issued its decision and concluded that Kaho'ohalahala was a resident of Lahaina. Id. at 310, 219 P.3d at 1097. The Board's decision provided that "[i]n the event of an appeal of this decision, Mr. Kaho'ohalahala shall be allowed to vote 'provided that the ballot is placed in a sealed envelope to be later counted or rejected in accordance with the ruling on appeal.' See [HRS] § 11-25(c)." Id. at 311, 219 P.3d at 1098.

Here, unlike Kaho'ohalahala in Dupree, the Galuterias voted prior to Baker's challenge and appeal to the Board. HRS § 11-25(c) permits a challenged voter to vote after an appeal is filed with the Board provided that the ballot is "placed in a sealed envelope." HRS § 11-25(c) does not address the circumstances under which a challenged voter casts his or her vote prior to his or her eligibility being challenged and prior to the filing an appeal to the Board. Likewise, HAR § 3-172-103 presupposes that the City Clerk had the opportunity to segregate the challenged voter's ballot. See HAR § 3-172-103(a) ("the ballot shall remain in the sealed envelope. . ."); HAR § 3-172-103(b) ("the voted ballot shall remain in the unopened envelope. . .") (emphases added).

For these reasons, we reject Baker's contention that the Board clearly erred by finding that the Galuterias' ballots could not be isolated and by incorrectly interpreting the Clerk's obligations under HRS § 11-25 and HAR § 3-172-103.[8]

C.    Allegedly Unlawful Procedures

Baker contends that the Board acted under unlawful procedures and in excess of its authority when it considered and decided the Galuterias' Motion to Dismiss, the City's Joinder in the Motion to Dismiss, and the Galuterias' Motion to Strike, which sought to strike Baker's Second Response. Baker argues that the Board lacked the authority to consider and decide the Motion to Dismiss and Motion to Strike under HRS chapter 11 and HAR § 3-172-43. The Appellees submit that the Board had authority under HRS §§ 11-25 and 11-43, HAR § 3-172-43, and Dupree to consider and rule on the motions. The Galuterias also argue that even if the Board erred in considering a dispositive motion, it was harmless error.

HRS § 11-43 (2009) states:

> § 11-43 Powers; procedures. (a) Each board of registration is given all of the powers and authority for the summoning and examining of witnesses and the maintenance of order, including the power to punish for contempt and

---

[8]    Baker also contends that the Clerk failed to act upon Baker's challenge in a timely manner and improperly considered whether Baker's challenge was moot. Baker cites no authority supporting the proposition that the three-month period for the Clerk's investigation and decision was unreasonable. In addition, Baker fails to identify how, under the circumstances of this case, he is aggrieved by the Clerk's consideration of whether the challenge was mooted by the fact that the Galuterias' ballots had already been cast. The Clerk nevertheless conducted a complete investigation of the Galuterias' residency and issued a decision on the matter, which was then appealed to the Board and given a full hearing. These further contentions are without merit.

award witness fees in accordance with section 621-7, by law given to circuit courts.

(b) Every member of the board of registration may administer oaths in all cases in which oaths are by law authorized.

(c) The procedures for challenges and appeals under sections 11-25 and 11-26 and this part shall be exempt from the provisions of chapter 91 regarding contested case hearings, but shall be administered according to rules adopted by the chief election officer.

Therefore, by statute, the Board is given power and authority "for the summoning and examining of witnesses and the maintenance of order." HRS § 11-43(a). Furthermore, the statute states that the procedures for appeals "shall be administered according to rules adopted by the chief election officer." HRS § 11-43(c). One of the duly-promulgated rules, HAR § 3-172-43, states in relevant part:

(b) The board may hold an informal pre-hearing conference for the purpose of:

(1) Simplifying and clarifying issues;
(2) Making necessary or desirable amendments to the notice of the charges, or its answer, if any;
(3) Obtaining admissions of fact or documents to avoid unnecessary proof; limiting the number of expert witnesses; and
(4) Any other materials that may aid in the reasonable and expeditious disposition of the matter;

Notice and opportunity to participate shall be given to each party and each party's attorney. The entire board or one of its members designated for such purpose shall preside at the conference. No attempt at fact finding or argument shall be permitted. Prejudicial comment or conclusion on any issue being controverted shall not be made or stated at any time by any member or the presiding member of the board. Minutes of the conference shall be kept and agreements shall be concisely noted.

(c) The petitioner and the respondent shall have the opportunity to challenge any member of the board.

(d) The chairperson of the board shall be the presiding officer and shall be authorized to make any preliminary determinations necessary for the prompt and efficient management of the appeal hearing.

(e) Before presentation of the case, each party shall have the opportunity to make an opening statement. . . .

. . . .

(i) After all the evidence has been presented, the board shall give each party the opportunity to summarize. . . .

(j) At the end of the hearing, the board may give an oral decision or take the matter under advisement with a written decision to be issued at a later date. Regardless of whether the board gives an oral decision, the board shall issue a written decision, including findings of fact and conclusions of law.

Here, the Board construed the Galuterias' Motion to Dismiss as a motion for summary judgment, and applied a summary judgment standard in deciding on the motion. Receiving, hearing, and deciding a motion for summary judgment is not summoning or examining witnesses, nor is it maintaining order under HRS § 11-43(a).[9] No other "rules adopted by the chief election officer" allow for summary judgment proceedings. Summary judgment proceedings are not sanctioned in HAR § 3-172-43 or elsewhere in Chapter 172. Rather, it appears that, under HAR § 3-172-43, summary judgment proceedings are improper. First, the Board may only issue a decision "[a]t the end of the hearing," which calls for "opening statement[s]" and a "presentation of the case." HAR § 3-172-43(e) & (j). Subsection (b) specifically forecloses the possibility of pre-hearing summary judgment because, at the pre-hearing conference, "conclusion on any issue being controverted shall not be made or stated at any time by any member or the presiding member of the board." Summary judgment unquestionably

---

[9] However, consideration of a motion to strike submissions to the Board would appear fall within the Board's authority pursuant to HRS § 11-43 and HAR § 3-172-43.

constitutes a "conclusion on [an] issue being controverted." Subsection (b) also forbids argument in conjunction with a pre-hearing conference, which the parties necessarily do for summary judgment motions. Moreover, the Board concedes that the hearing on the motion for summary judgment "was not part of the prehearing conference[.]"

We conclude that the Board does not have authority to conduct summary judgment proceedings under HAR § 3-172-43(d). This provision addresses the chairperson's unilateral powers. Entering a decision on the merits of an appeal, on the other hand, would require the entire Board. See HAR § 3-172-43(j). Moreover, HAR § 3-172-43(d) gives the chairperson power for the management of the hearing process, not for the adjudication of the appeal itself.

The Galuterias further argue that, in Dupree, the supreme court recognized that the Board has authority to consider pre-hearing motions. In Dupree, Kaho'ohalahala filed a motion to dismiss for lack of jurisdiction, which was denied. 121 Hawai'i at 305, 219 P.3d at 1092. However, the issue of summary judgment is distinguishable from the determination of subject matter jurisdiction, which is an "absolute necessity;" the "lack of subject matter jurisdiction can never be waived by any party at any time." Chun v. Emps.' Ret. Sys. of State of Haw., 73 Haw. 9, 13, 828 P.2d 260, 263 (1992) (citation omitted). If the Board lacked jurisdiction, "its proceedings and decision must be

rendered void and legally ineffective." See, e.g., Ass'n of Apartment Owners of Governor Cleghorn v. M. F. D., Inc., 60 Haw. 65, 69, 587 P.2d 301, 304 (1978). Accordingly, while the Board may, as a preliminary matter, consider whether it has jurisdiction over a matter, such authority does not extend to summarily ruling on the merits of the matter submitted to the Board.

For these reasons, we conclude that the Board erred in considering the Galuterias' pre-hearing Motion to Dismiss.

Nevertheless, we further conclude the Board's error was harmless. HRS § 11-43 states that challenges to the Clerk and appeals to the Board are exempt from the provisions of HRS chapter 91 regarding contested case hearings, but does exempt judicial review of such proceedings from HRS chapter 91 standards. In Dupree, the supreme court stated that Del Monte identifies the applicable standard of review. 121 Hawai'i at 312, 219 P.3d at 1099. And in Del Monte, the supreme court "appl[ied] the standards set forth in HRS § 91-14(g) (1993) to the agency's decision." 112 Hawai'i at 498, 146 P.3d at 1075. HRS § 91-14(g) provides that the court "may reverse or modify the decision and order [of the agency] if the substantial rights of the petitioners may have been prejudiced[.]" See also S. Foods Grp, L.P. v. Dep't of Educ., 89 Hawai'i 443, 453, 974 P.2d 1033, 1043 (1999) ("Indeed, in order to reverse or modify an agency

decision, the appellate court must conclude that an appellant's substantial rights were prejudiced by the agency.").

Baker has not shown that his substantial rights have been prejudiced. The Board denied the Galuterias' Motion to Dismiss and Baker was given a full hearing before the Board. Baker has not shown that the summary judgment proceedings affected his ability to fully present evidence and arguments at the Hearing. Accordingly, we conclude that the Board's error was harmless.

D.    Other Challenged Pre-Hearing Procedures

Finally, Baker argues that the Board's prehearing actions, specifically its decision to conduct a second prehearing conference and its consideration of the Motion to Dismiss and Motion to Strike, constituted improper rulemaking under the Hawai'i Administrative Procedures Act (HAPA).

Under HAPA, a "rule" is defined as an

agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

HRS § 91-1 (2012).

"Additionally, Hawai'i appellate courts typically have discussed the meaning of the general definition of 'rule' in cases where there is a question of whether the agency action is legislative or adjudicative." Green Party of Haw. v. Nago, 138

Hawai'i 228, 237-38, 378 P.3d 944, 953-54 (2016) (citations omitted). The supreme court has recognized that "rule-making is essentially legislative in nature because it operates in the future; whereas, adjudication is concerned with the determination of past and present rights and liabilities of individuals where issues of fact often are sharply controverted." Id. at 238, 378 P.3d at 954 (quoting In re Application of Hawaiian Elec. Co., 81 Hawai'i 459, 467, 918 P.2d 561, 569 (1996)) (internal quotation marks omitted). On the other hand, "the purpose of rule-making is to govern the future conduct of groups and individuals, not determining damages resulting from past conduct." Pila'a 400, LLC v. Bd. of Land & Nat. Res., 132 Hawai'i 247, 266, 320 P.3d 912, 931 (2014).

While Baker contends that the Board could not hold a second prehearing conference, HAR § 3-172-43(b) provides that the Board "may hold an informal pre-hearing conference[.]" We do not read this provision so narrowly as to limit the Board to only a single pre-hearing conference and, therefore, conclude that Baker's argument is without merit.

However, with regard to the Board's consideration of summary judgment motions, we have concluded that the chief election officer has not properly adopted administrative rules with regard to these procedures. "Thus, if the challenged procedures qualify as 'rules' as defined in HAPA, then they are invalid for not complying with HAPA's statutory rulemaking

33

requirements." Green Party, 138 Hawai'i at 239, 378 P.3d at 955
(citation omitted).

We conclude that the Board's hearing of and decisions
on summary judgment motions has "general or particular
applicability" and "future effect" and "implements, interprets,
or prescribes law or policy" with respect to its determination of
a voter eligibility challenge. The same procedures that applied
to Baker's challenge in this case would apply to future
challenges to an individual's eligibility to vote. Accordingly,
the Board's summary judgment procedure is a rule as defined in
HRS § 91-1(4), and subject to the rulemaking procedures of HAPA.

Although the Board's summary judgment procedures were
conducted pursuant to an invalid rule, in light of the fact that
the Galuterias' Motion to Dismiss was denied and the Board
conducted a full evidentiary hearing on Baker's challenge, we
conclude that the improper procedure was harmless and does not
require a remand for a further hearing. See, e.g., Korean
Buddhist Dae Won Sa Temple of Haw. v. Sullivan, 87 Hawai'i 217,
241, 953 P.2d 1315, 1339 (1998) ("In conducting [an HRS § 91-
14(g)] review, this court must often employ a type of harmless
error analysis to violations of HAPA.")

V.   CONCLUSION

We conclude that, although the Board improperly
considered the Galuterias' Motion to Dismiss, the Board's action
constituted harmless error. We otherwise affirm the Board's

34

January 15, 2016 Order.  Baker's request for attorney's fees and costs is hereby denied.

Lance D. Collins,
for Appellant/Appellant.

William C. McCorriston,
Jessica M. Wan,
(McCorriston Miller Mukai
 MacKinnon LLP),
for Appellees/Appellees,
BRICKWOOD M. GALUTERIA and
  ABIGAIL L. GALUTERIA.

Ernest H. Nomura,
Deputy Corporation Counsel,
City and County of Honolulu,
(Leslie P. Chinn, Deputy
 Corporation Counsel, City and
 County of Honolulu, with him —
 on the answering brief),
for Appellee/Appellee,
GLEN TAKAHASHI, in his official
 capacity as City Clerk, City and
 County of Honolulu.

Ewan C. Rayner,
Deputy Solicitor General,
(Patricia Ohara and Valri Lei
 Kunimoto, Deputy Attorneys
 General, State of Hawaiʻi,
 on the brief).